## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SILICON VALLEY INNOVATION COMPANY, LLC, | Case No. 12-13318 (PJW) |
| Debtor. | **Hearing Date: TBD**<br>**Objection Deadline: TBD** |

### MOTION OF CHRISTIAN JAGODZINSKI FOR AN ORDER DISMISSING THE DEBTOR'S BANKRUPTCY CASE WITH PREJUDICE PURSUANT TO SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY CODE

Christian Jagodzinski ("Jagodzinski"), a creditor and limited liability company Member of Silicon Valley Innovation Company, LLC (the "Debtor" or "SVIC"), by and through his undersigned counsel, hereby files this Motion for an Order Dismissing the Debtor's Bankruptcy Case with Prejudice Pursuant to Sections 1112(b) and 305(a) of the Bankruptcy Code (the "Motion") and states as follows:

### PRELIMINARY STATEMENT

This case is the bad faith re-filing of a prior bad faith bankruptcy case that was dismissed by this Court just two weeks ago, on November 28, 2012. This case, just like SVIC's last chapter 11 case, was hastily filed on the eve of a hearing in the Court of Chancery of the State of Delaware (the "Chancery Court") relating to Jagodzinski's request for the appointment of a receiver for SVIC. SVIC's bad-faith tactics (undertaken at the direction self-dealing insiders) have spanned the course of the past two years and this re-filing is nothing more than SVIC's latest tactic in a long course of conduct designed to shield its records from investors and cover up not only the mismanagement of SVIC, but also the apparent misuse of company funds (or worse) by SVIC's principal, Riverson Leonard ("Leonard"). Rather than attempt to defend Jagodzinski's request for injunctive relief and appointment of a receiver in the Chancery Court,

US_ACTIVE-111361821.3-JCFALGOW

SVIC has attempted to continue its game of "keep-away" by re-filing another bad faith bankruptcy case.

There has been no material change in circumstances in the two weeks since the last case was dismissed, and, therefore, this serial filing is presumptively filed in bad faith and must be dismissed.  See In re Roxy Real Estate Co., Inc., 170 B.R. 571, 574 (Bankr. E.D. Pa. 1993) (citing cases).  Just like the first time, this chapter 11 bankruptcy case has no reorganization purpose.  SVIC is a holding company with one employee and no operations.  For years, SVIC has been grossly mismanaged and its funds have been misappropriated.  The Debtor's books and records have been wholly disregarded and even *destroyed during active litigation*.  Due to the Chancery Court's familiarity with SVIC's misconduct and prior contempt orders, SVIC is attempting to retain control and keep the Chancery Court's jurisdiction at bay through bad faith tactics and abuse of the bankruptcy process.

## FACTUAL BACKGROUND

A.    **Jagodzinski's Investment in SVIC and Request to Inspect Books and Records**

In 2000, Jagodzinski originally invested $1,000,000 in Silicon Valley Internet Capital, Inc., a Delaware corporation.  In or about 2001, through mergers and name changes, Silicon Valley Internet Capital, Inc., merged into SVIC, and Jagodzinski's interest was converted to a limited liability company membership interest in SVIC.

On or about September 16, 2010, Jagodzinski served SVIC with a written demand (the "First Demand") to inspect SVIC's books and records.  Over the next several months, SVIC provided some limited information, including some tax returns and some documents relating to transactions specifically identified by Jagodzinski.  Despite this initial limited cooperation, after approximately December 8, 2010, SVIC refused or failed to respond at all to any communications from Jagodzinski's counsel.

2

Therefore, on January 25, 2011, Jagodzinski served upon SVIC's registered agent for service of process in Delaware another written demand (the "Second Demand") to inspect SVIC's books and records that had not been produced.  Jagodzinski's counsel also sent a courtesy copy via email to counsel for SVIC.  SVIC did not respond to the Second Demand.

**B.    The Books and Record Action in the Delaware Court of Chancery**

**1.    The Verified Complaint, Default Judgment and Appeal**

On February 18, 2011, Jagodzinski filed a Verified Complaint in the Chancery Court seeking, *inter alia*, access to the books and records of SVIC.  SVIC did not answer or otherwise respond.  Therefore, on April 1, 2011, Jagodzinski filed a Motion for a Rule to Show Cause Why a Default Judgment Should Not Be Entered Against SVIC (the "Motion to Show Cause").  After SVIC failed to respond to the Motion to Show Cause, on May 4, 2011, the Chancery Court entered a Default Judgment against SVIC, ordering it to produce the documents requested in Jagodzinski's Second Demand (the "Default Judgment").

Rather than comply with the Chancery Court's simple directive to turn over documents, SVIC went to great lengths to shield its records from Jagodzinski.  On May 20, 2011, SVIC moved to vacate the Default Judgment and dismiss the Complaint for failure to state a claim (the "Motion to Vacate").  SVIC argued that its failure to appear was due to its prior inability to pay for counsel and that SVIC's First Demand and Second Demand were technically deficient since SVIC's counsel submitted the demands, not Jagodzinski as the member of SVIC himself.  At the oral argument on August 3, 2011, the Court denied SVIC's Motion and, due to the meritless nature of the arguments advanced by SVIC, awarded Jagodzinski his costs.

SVIC then appealed the Chancery Court's denial of the Motion to Vacate and filed a Motion for a Stay Pending Appeal (the "Stay Motion").  After rounds of briefing on the Stay Motion, both the Chancery Court and Delaware Supreme Court denied SVIC's requests for a

stay pending appeal.  Thereafter, SVIC dismissed its appeal.

SVIC's efforts to fight document production yielded nothing but delay, legal fees, and an assessment of costs against SVIC.

**2.      The First Motions for Contempt and Withdrawal of SVIC's Counsel**

Even after dismissing its appeal, SVIC still refused to comply with the Chancery Court's Order to turn over documents to Jagodzinski.  Accordingly, on September 1, 2011, Jagodzinski filed its Motion for Contempt (the "First Contempt Motion").  Following the filing of the First Contempt Motion, SVIC produced only 5 documents (totaling 88 pages).

Given the inadequate production by SVIC, Jagodzinski filed a Supplemental Motion for Contempt on September 12, 2011 (the "Supplemental First Contempt Motion").  Shortly thereafter, on September 28, 2011, counsel for SVIC moved to withdraw "on the ground that a lack of communication from the client has rendered counsel unable to fulfill its duties to the client and the Court."  The Chancery Court granted counsel's motion to withdraw.

On October 20, 2011, the Chancery Court granted Jagodzinski's Supplemental First Contempt Motion and entered a contempt order directing SVIC to: (i) produce the documents identified in the Default Judgment; (ii) pay Jagodzinski his previously awarded costs; and (iii) make Leonard available by deposition by November 18, 2011 (the "First Contempt Order").

**3.      The Second Motion for Contempt**

SVIC simply ignored the First Contempt Order.  It failed to produce any additional documents and failed to produce Leonard for a deposition as ordered.  Therefore, on November 21, 2011, Jagodzinski filed a second Motion for contempt and for the appointment of a receiver (the "Second Contempt Motion").  In the Second Contempt Motion, Jagodzinski *again* requested that the Chancery Court order SVIC to turn over certain books and records, but also moved for the appointment of a receiver to effectuate the Chancery Court's Orders.  After the filing of the

Second Contempt Motion, SVIC partially complied with the First Contempt Order by making Leonard available for a deposition on December 21, 2011.

On February 14, 2012, the Chancery Court issued an opinion deciding the Second Contempt Motion (the "Contempt Opinion"), a copy of which is attached as Exhibit A.  In the Contempt Opinion, the Chancery Court found that "SVIC has not produced all the books and records called for in the August Order, despite having numerous opportunities to comply." See Contempt Opinion, Exhibit A at p. 7.  The Chancery Court also found that "the evidence demonstrates that the Company's sole employee, Leonard, cannot be relied upon to produce all the documents required under the August Order." Id.

Contemporaneous with its Contempt Opinion, the Chancery Court entered the Contempt and Receiver Order (the "Receiver Order") appointing Bram Portnoy as the receiver of SVIC ("Portnoy" or the "Receiver") for the "specific purpose of completing the production of documents ordered produced in this Court's Orders dated August 9, 2011, October 20, 2011, and November 28, 2011."  Furthermore, the Receiver Order sanctioned SVIC, awarding Jagodzinski reasonable fees and expenses incurred in connection with his Motions for Contempt.  A judgment was then entered against SVIC for these fees and expenses in the amount of $10,000. Copies of the Receiver Order and Judgment are attached as Exhibits B and C, respectively.

The Receiver Order also specifically permitted the Receiver to seek additional powers during the course of his investigation, including but not limited to the power to pursue direct or derivative claims of SVIC against any SVIC "member, manager, officer, any of their affiliates, or any third party." See Receiver Order, Exhibit B at p. 4, ¶ 12.  The Receiver Order further provided that the conduct of "SVIC, . . . Leonard, . . . any manager with control over SVIC, and anyone acting on their request or behalf is limited to performing the usual transactions, customs,

and practices that are within the ordinary course of business of the Company" until the Receiver

was discharged from his receivership duties by the Chancery Court.  Id. at p. 4, ¶ 13.

C.      **The Receiver's Investigation of SVIC's Books and Records**

        Pursuant to the Receiver Order, the Receiver pursued SVIC's books and records on

numerous fronts by, *inter alia*, identifying and contacting SVIC's counsel, its storage facility,

former investors, accountants, and banks.  See Declaration of Bram Portnoy in Support of

Jagodzinski's Motion to Dismiss SVIC's first chapter 11 bankruptcy case (the "Portnoy Decl."),

attached as Exhibit D hereto, at ¶ 2.  From the documents collected, Portnoy identified numerous

instances of wrongful conduct, including gross mismanagement, payment of personal expenses

from SVIC funds, inexplicable withdrawals of cash from SVIC's bank account and abuse of the

corporate form.  The Receiver also discovered that, *during the pendency of SVIC's attempts to*

*vacate the Chancery Court's orders*, SVIC ignored multiple notices from its storage facility

regarding nonpayment of past due amounts and allowed SVIC records to be destroyed.

        1.      **Mismanagement of SVIC**

        SVIC has no operations and currently has one employee and manager, Leonard.  See

Deposition of Riverson Samuel Leonard, Jr. on December 21, 2011 (the "Leonard Depo."),

relevant portions of which are attached as Exhibit E, at 82:3-7 and 138:25-139:5.  Due to the fact

that it has no operations or employees, SVIC has "relatively little" expenses.  See Leonard Depo.

at 180:16-19.  Nonetheless, SVIC has managed to quickly dissipate any funds that it receives.

        For example, on April 25, 2011, Robert Shaw ("Shaw"), a former director and officer of

SVIC, paid $1,512,000 to SVIC in partial repayment of an outstanding loan made by SVIC to

Shaw.  See Leonard Depo. at 63:19-64:3; Portnoy Decl. at ¶ 9.  Within three months, SVIC and

Leonard had spent *all* of these funds.  See Portnoy Decl. at ¶ 9.  Inexplicably, at his deposition,

Leonard did not know what the funds were used for and stated that he would "have to do the

research and get back to you."  <u>See</u> Leonard Depo. at 181:9-12.

Leonard also did not know the answers to a number of basic questions about SVIC despite his position as SVIC's sole manager and employee.  For example, Leonard did not know whether there were SVIC documents in addition to the 88 pages produced to Jagodzinski in September of 2011.  Id. at 43:10-45:1.  Leonard did not know when he became CFO of SVIC or for how long he had been CFO.  Id. at 44:17-24.  In total, Leonard responded "I don't know" or "I don't recall" approximately 185 times during his deposition.  Additionally, Leonard made it very clear at his deposition that he views his fiduciary duties to SVIC as a nuisance:

> Q. Why are you contemplating winding down Silicon Valley Innovation Company, LLC?
>
> A. Because it's -- basically it's just a holding company at the moment. If I could wind it down, I probably would.
>
> Q. Why?
>
> A. What does this have to do with documents?
>
> Q. It has everything to do with documents. Answer my questions, please, sir. Why?
>
> A. **Because it's a pain in my butt. How about that? I don't know**.

<u>See</u> Leonard Depo. at 154:19-155:4 (emphasis added).

At his deposition, Leonard was also unaware of basic details about SVIC's primary assets, which include (i) outstanding loans from SVIC to its managers (including Leonard) totaling over $5.75 million, exclusive of interest and equity (the "<u>Insider Loans</u>"), and (ii) equity interests in portfolio companies.  For example, Leonard did not know the value of the Insider Loans.  Id. at 76:22-77:4.  Leonard was also unaware of how SVIC decided to make loans.  Id. at 67:13-15.

Despite the fact that the Insider Loans matured on December 31, 2007, SVIC is not

collecting any principal or interest due thereunder.  <u>See</u> Leonard Depo. at 160:2-01.  Per their

terms, the Insider Loans accrue interest at a rate of 5% (except for the loan to Peder Jungck,

which had a rate of 6%), yielding $287,500 in annual interest.  <u>See</u> Portnoy Decl. at ¶ 4.

According to Leonard, the maturity dates of Insider Loans were purportedly extended "another

ten years".  <u>See</u> Leonard Depo. at 160:2-4.  Apparently, when the loans were extended in 2007,

SVIC's managers instructed its accountant to stop accruing interest on the Insider Loans on

SVIC's books and balance sheet.  <u>See</u> Portnoy Decl. at ¶ 5.  The Receiver's investigation has

also revealed other outstanding loans made by SVIC that are not being collected.  <u>See</u> Portnoy

Decl. at ¶ 7.

        In addition to gross mismanagement of its notes receivable, SVIC is also mismanaging its

interests in its three portfolio companies: Zone Wellness ("<u>Zone Wellness</u>"), Agiliance, Inc.

("<u>Agiliance</u>") and Balanced Health ("<u>Balanced Health</u>" and collectively with Zone Wellness and

Agiliance, the "<u>Portfolio Companies</u>").  At his deposition, Leonard was disturbingly unaware of

basic details about the Portfolio Companies, despite the fact that they are SVIC's only active

investments.  <u>See</u> Leonard Depo. at 136:16-19.  For example, Leonard did not know how much

SVIC had invested in any of these companies.  Id. at 127:10-20 and 147:6-8.  When asked who

was in charge of Zone Wellness, Leonard said "I guess I am."  Id. at 127:1-2.  When asked

whether SVIC had any other assets aside from its equity in the Portfolio Companies, Leonard

responded:

> I believe it retained some property in some of the earlier companies, but I have no
> idea what shape or form that was in or how or where it was ever kept.  I know
> very little about that.

Id. at 183:13-19.

        In addition, through his investigation, the Receiver also identified at least one specific

instance in which SVIC's equity holdings in Agiliance were diluted due to SVIC's inaction.

Specifically, in February 2010, SVIC was provided documents regarding a proposed Agiliance bridge financing and soliciting SVIC's involvement therein.  See Portnoy Decl. at ¶ 8.  SVIC's sole manager, Leonard, did not share this information with anyone, investors or otherwise, in order to facilitate discussions of the advisability of such an investment.  Id.  Rather, Leonard simply ignored the documents, let the offer lapse, and allowed SVIC's equity holdings to be diluted.  Id.

      2.    **Misuse of SVIC Funds**

Through subsequent investigation, including procuring and reviewing SVIC's bank account statements, the Receiver identified numerous instances of Leonard's apparent misuse of SVIC funds.  From the time that Shaw repaid the $1.512 million in April, until July when SVIC's bank account was again depleted, over $500,000 was removed through cash withdrawals or transfers to other bank accounts.  See Id. at ¶ 10 (listing transfers).

In addition, SVIC utilized $534,000 of the $1.512 million for the purported purpose of "cut[ting] a check to the U.S. Treasury."  See Id. at ¶ 11 and Exhibit 1.  This disbursement request was made by Alex Hern ("Hern"), a former officer and director of SVIC, to SVIC's counsel (which apparently effectuated the transfer from its trust account).  See Id. at ¶ 11. However, SVIC's accountant advised the Receiver that it is not possible that SVIC owes any taxes, given the offsetting losses SVIC incurred in recent years.  See Id. at ¶ 12.  Thus, this withdraw of $534,000 from SVIC was clearly not for SVIC's taxes.

The Receiver also discovered that SVIC transferred large sums of cash to Balanced Health.  Hern was the founder of Balanced Health and is in charge of that entity's operations. See Leonard Depo. at 137:6-13.  Leonard is also an employee of Balanced Health.  See Portnoy Decl. at ¶ 13**.**  Shortly after receiving the $1.5 million in April of 2011, SVIC opened a Paychex payroll account for the benefit of Balanced Health and thereafter transferred $35,000 every two

weeks for the approximately 3 months until SVIC's funds were entirely dissipated.  Id.

The Receiver's investigation also revealed that SVIC's funds were used for Leonard's personal expenses through charges on SVIC's credit/debit card, including charges for Best Buy, "Prisma Entertainment", "Fine Wines", haircuts, carwashes and other personal expenses that could not possibly have any legitimate business purpose.  See Id. at ¶ 14.

Through subsequent investigation, the Jagodzinski and the Receiver have discovered that "Prisma Entertainment" is a name used for credit card billing purposes by the "Plan B" gentlemen's club, an exotic dancing establishment in Los Angeles, CA.  There can be no explanation for why nearly $2,000 of SVIC's funds were spent (presumably by Leonard) at an exotic dancing establishment when SVIC has no active business or clients.

Due to Leonard's dissipation of SVIC's cash, SVIC has no funds for use in operations. See Leonard Depo. at 62:9-17.

### 3.    Destruction of Documents

In addition to SVIC's mismanagement of its assets, SVIC's books and records have been entirely neglected.  During the pendency of Jagodzinski's books and records action in the Chancery Court, *while SVIC was fighting Jagodzinski's inspection demand and after the Chancery Court ordered that SVIC's documents be produced,* SVIC's management failed to take reasonable steps to preserve integral documents for SVIC's own records and to comply with the Chancery Court's Orders.  Specifically, due to SVIC's failure to pay its storage rent payments, SVIC's books and records were destroyed in August of 2011.

In August of 2006, SVIC entered into a five-year contract for Records Management, Storage, Retrieval & Delivery Services with Archive America of California, Inc. ("AAC").  See Portnoy Decl. at ¶ 15.  On November 29, 2010, AAC sent a letter by certified mail to SVIC stating that the contract with AAC was past due in the amount of $3,516.11.  See Id. at ¶ 16  The

letter further stated that its previous attempts to contact SVIC or its representatives regarding the past-due account were to no avail, and that it would turn the account over to a collection agency if SVIC failed to make payment by December 9, 2010.  See Id.

On August 2, 2011, AAC sent SVIC a letter stating that its account was past due in the amount of $6,270.52.  See Id. at ¶ 17 and Exhibit 3.  The letter further stated that it "serve[d] as a 15 day advance written notification of the destruction of your Deposits currently stored with Archive America Limited."  Id.  The letter concluded by stating that AAC would "proceed with the destruction of Deposits that remain in [its] facility" if it were not contacted by August 17, 2011.  Id.

Jagodzinski made his initial books and records demand upon SVIC by letter dated September 16, 2010 and subsequently commenced an action in the Chancery Court on February 18, 2011.  On May 4, 2011, the Chancery Court entered the Default Judgment ordering SVIC to produce requested books and records to Jagodzinski.  Despite the fact that SVIC and Leonard had been on notice for almost an entire year and *had been ordered by the Chancery Court to turn over document for inspection*, SVIC did nothing to locate or preserve its documents.

In fact, even after the Chancery Court entered the First Contempt Order, SVIC did not take any steps, let alone reasonable and adequate steps, to preserve its documents held by AAC. On December 2, 2011, approximately seven months after the Default Judgment was entered and six weeks after the First Contempt Order was entered, Leonard finally sent an email to AAC to inquire about the SVIC documents in their possession.  AAC informed Leonard that "SVIC did not respond to our numerous attempt [sic] to collect the past due balance and all of the records have been destroyed . . . ."  See Portnoy Decl. at ¶ 18.

**4.      Settlement of Previous Lawsuit to Shield Information from Investors**

The Receiver's investigation also uncovered SVIC's prior attempts to avoid disclosure of

books and records to investors.  On November 22, 2006, Robert D. Evans ("Evans"), a former

investor in SVIC, filed a lawsuit against Ronald A. and Suzan C. Oxtal (two of the forty-three

members of SVIC's investment vehicle Silicon Valley Investors I, LLC) to investigate potential

wrongdoing in SVIC.  Id. at ¶ 20.

     As articulated in a February 3, 2006, letter from Evans' counsel to Ron Oxtal, Evans was

seeking a full financial disclosure on SVIC by "opening and disclosing their books for Mr.

Evans."  Id. at ¶ 20 and Exhibit 4.  Further, Evans stated that he was "prepared to seek an

accounting order . . . should he not receive the documents voluntarily."  The letter further

provided that if SVIC did not wish to open its books and desired to avoid a legal proceeding,

Evans was willing to accept his original $200,000 investment back in settlement of the lawsuit.

Id.

     In a letter from Kim Schwencke regarding reimbursement of the settlement/investment,

she stated that, "[i]n order to remove the troublesome Mr. Evans from any claims . . . Ron Oxtal

and myself put up the $200,000 to repurchase Evans [sic] shares."  Id. at ¶ 21 and Exhibit 5.  The

letter indicates that Hern instructed Ron Oxtal and Kim Schwencke to structure the settlement in

a manner that would obligate those parties to pay the settlement, with the understanding that

SVIC would reimburse them for those sums.  Id.  Schwencke's letter requested that SVIC repay

those funds.  Id.  Thus, through this process, it appears that SVIC bought out Evans to avoid his

inquiries.  Id.

## D.    The Receivership Complaint

     Based upon the evidence of gross mismanagement and wrongful conduct uncovered

during the Receiver's investigation, on March 30, 2012, Jagodzinski filed a Verified Complaint

(the "Receivership Complaint") seeking appointment of a receiver to take charge of SVIC's

business affairs for the benefit of its stakeholders.  Contemporaneously with the Receivership

Complaint, Jagodzinski filed a Motion for a Temporary Restraining Order prohibiting SVIC

from taking any harmful actions regarding its assets (the "TRO Motion") and a Motion to

Expedite proceedings (the "Motion to Expedite").

The Receivership Complaint was filed in the late afternoon on Friday, March 30, 2012.

By early in the afternoon on Monday April 2, 2012, the Chancery Court had entered an Order of

finding "that Plaintiff has asserted a colorable claim for the appointment of a Receiver and the

likelihood of irreparable harm" and setting a hearing on the TRO Motion and Motion to Expedite

for April 11, 2012, at 2:00 p.m.  A copy of the Chancery Court's April 2, 2012, Order is attached

as Exhibit F.

**E.      SVIC's First Bad Faith, Improperly Venued Bankruptcy Case**

At 9:28 p.m. on April 10, 2012, the night before the first-scheduled hearing in the

Chancery Court on Jagodzinski's TRO Motion and Motion to Expedite, SVIC filed an

improperly-venued voluntary chapter 11 case in the United States Bankruptcy Court for the

Northern District of California (the "California Bankruptcy Court"), Case No. 12-52706-ASW.

On May 3, 2012, Jagodzinski filed his Motion for an Order (I) Dismissing the Debtor's

Bankruptcy Case Pursuant to Sections 1112(b) and 305(a) of the Bankruptcy Code, or (II)

Dismissing or Transferring the Debtor's Case Due to Improper Venue (the "First Motion to

Dismiss").

During the course of that first bankruptcy case, SVIC never took any action in

furtherance of any valid reorganization purpose.  Indeed, while the case was pending in the

California Bankruptcy Court (for over four months), the only Motions that the Debtor filed were

Motions to extend deadlines and a Motion to convert the case to chapter 7, which was filed as a

tactic on the eve of the first scheduled meeting of creditors pursuant to 11 U.S.C. § 341 (the

"California 341 Meeting").  The Debtor's representative then failed to attend the California 341

Meeting.

The First Motion to Dismiss was fully briefed in the California Bankruptcy Court, and on July 12, 2012, the California Bankruptcy Court held a hearing on the First Motion to Dismiss, at which SVIC was represented by counsel.  On August 30, 2012, the California Bankruptcy Court issued its Memorandum Decision Granting Creditor Christian Jagodzinski's Motion to Transfer Venue, transferring venue of the case to this Court for further proceedings on Jagodzinski's First Motion to Dismiss.

The case was then transferred to this Court on September 21, 2012.  On November 15, 2012, this Court held a status conference on Jagodzinski's First Motion to Dismiss and scheduled it for hearing on November 27, 2012, at 1:30 p.m.  At that status conference, the Office of the United States Trustee indicated to the court that the Hiller & Arban firm had previously contacted their Office regarding their potential representation of SVIC, but subsequently indicated that they were not being retained as counsel.[1]  Thus, despite the requirements of Local Rule 9010-1(d), SVIC never retained Delaware counsel in the prior bankruptcy case.

The Office of the United States Trustee scheduled the first meeting of creditors for November 27, 2012, at 10:00 a.m. (the "Delaware 341 Meeting").  Specific notice of the Section

---

[1] It is clear that SVIC had notice of all proceedings.  Specific notice of November 27, 2012 hearing was sent to Leonard at his home address via overnight mail.  In addition, in an October 24, 2012 email from SVIC's California bankruptcy counsel to Ms. Sarkessian, Trial Attorney for the Office of the United States Trustee, SVIC's counsel wrote:

> I have made it absolutely clear to my client as soon as the hearing on the motion to transfer, which the California judge granted at the hearing more than two months ago, that it had to find local counsel in Delaware as I do not and cannot practice in those courts, as I am not admitted to the District Court in Delaware, and I am not aware of the local practice there.

> I have emailed my client more them ten times to that effect, and they have assured me they would find local representation.  I told them that the case could be dismissed if they are not represented by an attorney, as they cannot represent themselves without counsel.

A copy of this email was filed with the Court.  See D.I. 61, Case No. 12-12652 (PJW).

341 Meeting and hearing were provided to Leonard.  However, on November 27, 2012, no

representative of the Debtor appeared at the Delaware 341 Meeting.  Later that afternoon, at the

hearing, this Court granted Jagodzinski's First Motion to Dismiss and subsequently entered an

Order dismissing the case on November 28, 2012.

## **DISCUSSION**

**A.     THIS CASE, FILED JUST TWELVE DAYS AFTER DISMISSAL OF SVIC'S
         PRIOR CHAPTER 11 CASE, IS PRESUMPTIVELY FILED IN BAD FAITH
         GIVEN THE LACK OF ANY CHANGE IN CIRCUMSTANCES SINCE
         DISMISSAL.**

        For the second time now, SVIC has filed a bad faith bankruptcy case on the evening prior

to the Chancery Court's hearing in underlying Chancery Court receivership proceeding.  Nothing

changed for SVIC (which has no operations or employees) in the twelve days since the Court

dismissed its last chapter 11 case.  As such, this case can be presumptively viewed as a bad faith

filing that must be dismissed.  Although the Bankruptcy Code does not contain any express

limitation against serial chapter 11 filings, "many courts have recognized that a debtor does not

have the right to file another bankruptcy reorganization case (under chapters 11, 12, or 13) after

dismissal of an earlier one, *unless there has been a material change of financial circumstances*

which demonstrates that the second attempt would succeed after the first had failed."  See In re

Roxy Real Estate Co., Inc., 170 B.R. 571, 574 (Bankr. E.D. Pa. 1993) (citing cases) (emphasis

added).

        Indeed, "[w]hen there are successive reorganization bankruptcy filings without any

material changes in circumstances, the second filing is viewed as in 'bad faith.'"  Id.  The only

change in circumstances that occurred within the past twelve days was the Chancery Court's re-

setting of a hearing in the receivership proceeding.  The only purpose of this bankruptcy, which

*for the second time* was filed on the eve of that hearing, was to stay the Chancery Court

proceedings.  Under these circumstances, this case must be dismissed.  To hold otherwise would contravene the equitable jurisdiction of this Court.  See In re SGL Carbon Corp., 200 F.3d 154, 161 (3d Cir. 1999) ("A debtor who attempts to garner shelter under the Bankruptcy Code . . . must act in conformity with the Code's underlying principles"); see also In re Little Creek Dev. Co., 779 F.2d 1068, 1072 (5th Cir.1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons ... available only to those debtors and creditors with 'clean hands.' "); see also 7 Collier on Bankruptcy at 1112-68 ("Another basic underpinning of the good faith doctrine is the equitable concept of 'clean hands.' As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion.").

**B.      THE COURT MUST DISMISS THE DEBTOR'S BANKRUPTCY CASE FOR "CAUSE" PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE.**

Section 1112(b) of the Bankruptcy Code, as amended, *requires* a court to dismiss or convert a case if a creditor establishes "cause," absent "unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of the creditors and the estate".  See 11 U.S.C. § 1112(b)(1).  The "unusual circumstances" exception to the mandatory nature of dismissal or conversion does *not* apply where the "cause" for dismissal or conversion is continuing or substantial loss.  See 11 U.S.C. § 1112(b)(2)(B).

The factors listed in the statute are non-exhaustive.  See 11 U.S.C. § 1112(b)(4); 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting); see also In re St. Paul Self Storage Limited Partnership, 185 B.R. 580, 582 (B.A.P. 9th Cir. 1995); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978 ("list is not exhaustive" and courts should "consider other factors as they arise"), reprinted in 1978 U.S.C.C.A.N. 5787, 5903;

H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977) (same), reprinted in 1978 U.S.C.C.A.N.

5963, 6362.

The Debtor carries the burden "to establish that they filed their petitions in good faith to

preserve the Debtors' going concern value or to maximize the value of the Debtors' estate, rather

than as a litigation tactic." In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 298

(Bankr. D. Del. 2011) (citing Third Circuit precedents).

With respect to the Debtor's case, each of the following constitutes "cause" for dismissal:

(1) this case was filed in bad faith; (2) the continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation; (3) gross mismanagement of the estate; and

(4) the Chancery Court is well-suited and best positioned to resolve the disputes.

### 1.    This Bankruptcy Case was Filed in Bad Faith.

First, dismissal is appropriate because this case was filed in bad faith (for the second

time). While Section 1112(b) of the Bankruptcy Code does not by its terms state that a

bankruptcy petition must be filed in good faith, "courts have overwhelmingly held that a lack of

good faith in filing a Chapter 11 petition establishes cause for dismissal." In re Marsch, 36 F.3d

825, 828 (9th Cir. 1994); see also In re SGL Carbon Corp., 200 F.3d 154, 161 (3d Cir. 1999).

In dismissing cases based on a lack of good faith, courts attempt to "deter filings that

seek to achieve objectives outside the legitimate scope of the bankruptcy laws." Marsch, 36 F.3d

at 828.  "The requisite fact intensive inquiry requires determining where [the Debtor's] petition

falls along the spectrum ranging from the clearly acceptable to the patently abusive." SGL

Carbon, 200 F.3d at 162 (citing Marsch, 36 F.3d at 829).   A "Chapter 11 petition is not filed in

good faith unless it serves a valid reorganizational purpose." Id. at 165.  "Similarly, because

filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the

legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions

under these circumstances as well."  Id. (quoting Marsch); see also In re HBA East, Inc., 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

Court have also notes that factors constituting hallmarks of "bad faith" include: (i) the debtor has no employees other than principals; (ii) the debtor has little or no cash flow and no sources of funds to sustain a plan of reorganization; (iii) there are few unsecured creditors whose claims are relatively small; (iv) the debtor has lost in litigation with a single creditor about to exercise remedies, and (v) there are allegations of wrongdoing by the debtor or its principals. See In the Matter of Little Creek Development Company, 779 F.2d 1068, 1072-73 (5th Cir. 1986).

This bankruptcy case bears numerous badges of bad faith.  First, this bankruptcy case is clearly another litigation tactic.  It was, like the first Chapter 11 petition, hastily filed on the eve of a hearing in the Chancery Court regarding Jagodzinski's request for a TRO and expedited proceedings seeking appointment of a receiver for SVIC's business and assets.  The Chancery Court, which has consistently ruled against SVIC's meritless positions and twice held it in contempt, has become too familiar with the facts for SVIC's liking.  Therefore, it filed this second bankruptcy case just twelve days after dismissal in order to stay the Chancery Court proceedings (again) and to delay, deter and harass Jagodzinski's efforts to obtain appointment of a receiver for the benefit of SVIC's stakeholders.  Thus, "cause" exists for dismissal on these grounds.

Furthermore, it is apparent that this bankruptcy case has no reorganization purpose. SVIC is a holding company with no employees other than Leonard.  The lack of any docket

activity in SVIC prior bankruptcy case evidences that it never had any rehabilitative purpose and was merely filed to stay the Chancery Court proceedings.  Moreover, SVIC is uninterested in, and incapable of, reorganizing itself.  Leonard, SVIC's only manager and employee, has indicated in no uncertain terms that he has no interest in reorganizing SVIC.  <u>See</u> Leonard Depo. at 154:19-155:4.  At Leonard's direction, SVIC previously moved to convert the case to Chapter 7, indicating that he has no interest in attempting any reorganization.  Furthermore, based upon past conduct, it is clear that any funds received would not be used to rehabilitate SVIC's business.  SVIC's only recent cash infusion of $1.512 million in April of 2011 was quickly dissipated by Leonard through fund transfers to other accounts, payment of personal expenses and other inexplicable transfers of cash out of SVIC.  <u>See</u> Portnoy Decl. at ¶¶ 10, 13, 14.

In addition, SVIC does not have the funds to effectuate any chapter 11 plan.  In fact, SVIC does not have the funds necessary to administer the estate in this chapter 11 case.  <u>See</u> Leonard Depo. at 62:9-10.  The only purpose served by this chapter 11 case is to re-stay the Chancery Court litigation and delay matters to no apparent end.  The inevitable result of SVIC's tactics will be the depletion SVIC's limited estate through unnecessary administrative expenses associated with the chapter 11 process.  Under these circumstances, "cause" exists for dismissal. <u>See</u> <u>Matter of Namer</u>, 141 B.R. 603, 609 (Bankr. E.D. La. 1992) (dismissing case filed "as a litigation tactic with no intent or hope of legitimate reorganization" and holding that "[t]o permit Debtors to obtain bankruptcy protection under such circumstances would subvert the appropriate purposes of the bankruptcy process with the unseemly result of allowing the Bankruptcy Court to become a haven for wrongdoers."); <u>see</u> <u>also</u> <u>In re Monsour Med. Ctr., Inc.</u>, 154 B.R. 201, 208 (Bankr. W.D. Pa. 1993) (dismissing case where "the facts and circumstances surrounding this case compels the conclusion that the bankruptcy petition was filed as a litigation tactic by one

faction of debtor's board of directors in an attempt to reverse the setbacks it had suffered in state court."); In re Wally Findlay Galleries (New York), Inc., 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (dismissing case where "the debtor did not file its petition to reorganize, but rather as a litigating tactic"); In re First Fin. Enterprises, Inc., 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) ("It appears that this case should be dismissed pursuant to section 1112(b)(1) since there is an absence of a reasonable likelihood of rehabilitation.  The Debtor is a holding company and has no ongoing business operations.").

       **2.**        <u>**Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation.**</u>

Dismissal of this case is also appropriate due to the continuing losses to and diminution of the estate and absence of any likelihood of rehabilitation.  Although SVIC is sustaining ongoing costs, it has no funds and no operations or business activity to generate revenue.  <u>See</u> Leonard Depo. at 54:18-25 and 62:9-10.  In addition, SVIC is not properly managing its assets. SVIC is taking no action to collect any of the Insider Loans.  Id. at 160:2-10.  SVIC is also not taking any action to properly maintain its investments in the Portfolio Companies, as evidenced by SVIC's failure to act or even inform its investors about the dilution of its interests in Agiliance.  <u>See</u> Portnoy Decl. at ¶ 8.

In addition to its continuing losses, SVIC has no prospect of rehabilitation.  Indeed, Leonard has admitted, under oath, that he views SVIC as a nuisance that he does intend to rehabilitate.  <u>See</u> Leonard Depo. at 154:19-155:4.  Indeed, SVIC even moved to convert its case to chapter 7 during its prior bankruptcy case.  Based upon SVIC's course of conduct during the Chancery Court litigation and the Receiver's investigation, it is apparent that Leonard is an incompetent manager and incapable of even maintaining appropriate corporate records.  Indeed, the Chancery Court specifically found that Leonard "cannot not be relied upon" to produce SVIC

records in accordance with the Court's order.  <u>See</u> Contempt Opinion, Exhibit A at p. 7.

Furthermore, as described above, Leonard's deposition testimony makes is clear that he is

disturbingly unaware of basic, essential details regarding SVIC.  <u>See</u> *supra* at p. 7-9.

      **3.**        <u>**Gross Mismanagement of the Estate**</u>

Dismissal is also warranted due to gross mismanagement of SVIC's estate.  For the past

several years, SVIC's affairs have been neglected and mismanaged, while its funds have been

misappropriated.  First, Leonard has proven incapable of maintaining SVIC's business records.

While spearheading SVIC's frivolous litigation efforts to resist Jagodzinski's books and records

demand, Leonard never even attempted to locate SVIC's records and permitted AAC to destroy

all of its documents in storage.  <u>See</u> Portnoy Decl. at ¶¶ 16-18.  Leonard's disregard for court

orders has resulted in SVIC being held in contempt (twice) and the appointment of the Receiver.

The Receiver's investigation revealed evidence of apparent misuse and misappropriation

of SVIC funds.  From the time the $1.512 million was repaid by Shaw in April of 2011, until

July of 2011 when SVIC's bank account was again depleted, over $500,000 was removed

through cash withdrawals or transfers to other bank accounts.  <u>See</u> Portnoy Decl. at ¶ 10.  In

addition, SVIC utilized $534,000 of the $1.512 million, apparently at the direction of a *former*

SVIC officer, for the purported purpose of paying taxes.  Id. at ¶ 11.  However, SVIC's

accountant advised the Receiver that it is not possible that SVIC owes any taxes, given the

offsetting losses SVIC incurred in recent years.  Id. at ¶ 12.

The Receiver also discovered that SVIC transferred large sums of cash to Balanced

Health, which is one of SVIC's Portfolio Companies and which also employs Leonard and is

controlled by Hern.  <u>See</u> Leonard Depo. at 135:12-18 and 137:6-13.  Shortly after receiving the

$1.512 million in April of 2011, SVIC opened a Paychex payroll account for Balanced Health

and transferred $35,000 every two weeks into that account until SVIC's funds were entirely

dissipated.  See Portnoy Decl. at ¶ 13.  Any benefit to SVIC of these transfers is unclear, as

Leonard testified that Balanced Health was not profitable.  See Leonard Depo. at 136:7-12.

The Receiver's investigation also revealed that SVIC's funds were used for Leonard's

personal expenses through charges on SVIC's credit/debit card, including charges for Best Buy,

"Prisma Entertainment" (a gentleman's club/exotic dancing establishment), "Fine Wines",

haircuts, carwashes and other personal expenses that could not possibly have any legitimate

business purpose.  See Portnoy Decl. at ¶ 14.  Leonard apparently uses SVIC funds like they are

his own.

Currently, Leonard remains as SVIC's only manager and employee, operating SVIC as a

debtor-in-possession under chapter 11 of the Bankruptcy Code.  Not surprisingly, the Debtor has

not filed its statements or schedules, list of equity security holders or any substantive motions in

these bankruptcy cases.  Thus, the mismanagement is continuing.  These circumstances

constitute "cause" for dismissal.  See In re Products Int'l Co., 395 B.R. 101, 111 (Bankr. D. Ariz.

2008) ("Failure to maintain an effective corporate management team has been held to constitute

gross mismanagement.").

**4.**      **The Chancery Court is Informed and Well-Equipped to Act in the Best Interests of SVIC's Stakeholders.**

Dismissal of this case is also appropriate given the Chancery Court's familiarity with

SVIC and the procedural posture of that litigation.  This bankruptcy case was filed on the eve of

a hearing regarding Jagodzinski's TRO Motion and Motion to Expedite.  By the Receivership

Complaint and those Motions, Jagodzinski has not sought individualized relief, but rather, has

sought to maintain the status quo pending expedited proceedings in which the Chancery Court

would determine whether appointment of a receiver for SVIC is in the best interests of all

stakeholders.  To the extent that Jagodzinki prevailed, a receiver with fiduciary duties and to all

of SVIC's creditors and investors would be appointed to administer its affairs, subject to the

Chancery Court's oversight and control.  The Chancery Court, as a court of equity, is well-

equipped to fashion appropriate relief for the benefit of all of SVIC's stakeholders in the context

of the pending receivership action.  The Chancery Court's familiarity with this matter and its

ability to fashion equitable remedies for the benefit of SVIC's stakeholders constitutes further

cause for dismissal.  See In re Monsour Med. Ctr., Inc., 154 B.R. 201, 207 (Bankr. W.D. Pa.

1993) (addressing dismissal under Section 305 (abstention) and finding that dismissal is

"especially appropriate when another forum is available to determine the parties' interests and an

action has been commenced in that forum.").

The foregoing factors constitute ample cause mandating dismissal of this bankruptcy

case.

**C.      THE COURT SHOULD DISMISS THE DEBTOR'S BANKRUPTCY CASE
         PURSUANT TO SECTION 305 OF THE BANKRUPTCY CODE.**

Dismissal of this bankruptcy case is also appropriate pursuant to the abstention provisions

of Section 305(a) of the Bankruptcy Code.  This Court has already dismissed this case once in

favor of the Chancery Court receivership proceedings, and should do so again.  Section 305(a)(1)

provides, in pertinent part, that the court "may dismiss a case under this title . . . at any time if –

(1) the interests of creditors and the debtor would be better served by dismissal."  11 U.S.C.

§ 305(a).

Courts applying Section 305(a) have held that "[d]ismissal pursuant to section 305 is

especially appropriate when another forum is available to determine the parties' interests and an

action has been commenced in that forum."  In re Monsour Med. Ctr., Inc., 154 B.R. 201, 207

(Bankr. W.D. Pa. 1993); see also In re O'Neil Village, 88 B.R. 76, 80 (Bankr. W.D. Pa. 1988)

(citing cases).  Dismissal of this case under Section 305 is in the best interests of SVIC and its

stakeholders.  By dismissing this case, this Court will enable the Chancery Court (which is most familiar with SVIC, Leonard and the relevant factual background) to exercise its broad equitable powers to determine the best course for SVIC and its creditors and investors.  By the Chancery Court litigation, Jagodzinski is simply seeking the appointment of a receiver, with fiduciary duties to SVIC and all of its stakeholders, to manage SVIC affairs.  The Chancery Court, as a court of equity, is well-equipped to fashion appropriate relief for the benefit of all of SVIC's stakeholders in the context of the pending receivership action.  The Chancery Court's familiarity with this matter and its ability to fashion equitable remedies for the benefit of SVIC's stakeholders constitutes further cause for dismissal.  See Monsour, 254 B.R. at 207 ("Parties presently before this court also are before the state court.  There is no doubt that under the guidance of the learned state court judge . . . appropriate relief can be fashioned.  Accordingly, the present bankruptcy case will be dismissed pursuant to § 305(a)(1).").

Dismissal of this case under the abstention provisions of Section 305 will also prevent SVIC, which has re-entered this court in bad faith just days after its prior case was dismissed, from succeeding in its attempts to hinder and delay underlying receivership proceedings in the Chancery Court.  See SGL Carbon, 200 F.3d 154, 161 (3d Cir. 1999); see also In re Little Creek Dev. Co., 779 F.2d 1068, 1072 (5th Cir.1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.' "); 7 Collier on Bankruptcy at 1112-68 ("As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion.").

## D.    THIS CASE MUST BE DISMISSED WITH PREJUDICE TO PREVENT FURTHER BAD FAITH FILINGS.

The re-filing of this Chapter 11 case just twelve days after this Court's dismissal of

SVIC's prior bankruptcy case evidences that SVIC will continue to engage in bad faith litigation tactics unless the Court dismisses this case with prejudice to bar future filings.  In much less egregious circumstances, this Court has found "cause" to dismiss a chapter 11 case with prejudice pursuant to Section 549(a) of the Bankruptcy Code.  See JER/Jameson Mezz Borrower, 461 B.R. at 304 ("Because the Court finds that the Mezz II petition was filed in bad faith and for no legitimate bankruptcy purpose, it finds cause under section 349(a) to make the dismissal with prejudice."); see also In re Casse, 198 F.3d 327, 336-39 (2d Cir. 1999) (surveying cases and concluding that bankruptcy court had power under §§ 105 and 349 to dismiss chapter 11 case with prejudice and to permanently bar debtors who had filed serial bankruptcies simply to stop foreclosure sale from filing another bankruptcy case under any chapter); In re Riverbend Cmty., LLC, 2012 WL 1030340 (Bankr. D. Del. Mar. 23, 2012) (enjoining future bankruptcy filing and noting that "the public interest is served by preventing the harassment that comes from serial filings which interfere with legal process.").

**E.     JAGODZINSKI SHOULD BE AWARDED ATTORNEYS' FEES DUE TO THE EGREGIOUS NATURE OF THE BAD FAITH FILINGS**

SVIC's bad faith bankruptcy filings have been designed to make the proceedings as expensive as possible through tactics designed to hinder and delay.  For example, SVIC filed its first chapter 11 case in the California Bankruptcy Court, despite clearly improper venue.  In fact, SVIC inserted an outside counsel's office address on its first chapter 11 petition.  Then, in order to avoid attending the Section 341 Meeting and to prolong consideration of Jagodzinski's First Motion to Dismiss, SVIC moved to convert its case to Chapter 7.

The case was ultimately transferred to this District,  Despite having ample notice of the November 15, 2012 status conference (which was rescheduled from October 29, 2012 due to Hurrcan Sandy), as well as the Novmeber 27, 2012 hearing and Delaware 341 Meeting, SVIC

chose not to appear.  The Court then dismissed the prior chapter 11 case on November 28, 2012, in favor of the Chancery Court receivership proceeding.

Now, just 14 days later, SVIC has filed another bad faith case designed to delay and needlessly increase the cost of litigation.  It is clear that SVIC made the conscious decision not to appear in this Court in the prior case with the intention to sandbag Jagodzinski and this Court by re-filing a new Bankruptcy Case if and when the Chancery Court re-commenced its proceedings. Under these circumstances, an award of attorneys' fees and costs is warranted.  See Hall v. Cole, 412 U.S. 1, 5 (1973) ("it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'").

WHEREFORE, for the reasons set forth above, Jagodzinski respectfully requests that this Court enter an Order (i) granting the Motion, (ii) dismissing the Debtor's bankruptcy case with prejudice, (iii) awarding Jagodzinski's attorneys' fees and costs incurred in seeking and obtaining dismissal of SVIC's bad faith bankruptcy filings, and (iv) granting such further relief as is appropriate.

DATED:  December 12, 2012          REED SMITH LLP
          Wilmington, Delaware

                                   By /s/ J. Cory Falgowski
                                      Brian M. Rostocki (No. 4599)
                                      J. Cory Falgowski (No. 4546)
                                      1201 Market Street, Suite 1500
                                      Wilmington, DE 19801
                                      Telephone: 302 778 7500
                                      Facsimile: 302 778 7575
                                      Email: jfalgowski@reedmith.com

                                      Attorneys for Christian Jagodzinski